THE CINCINNATI BEVELING AND SILVERING CO. v.
MICHAEL PRECHT ET AL.

*Proceeding in Contempt.*

Charges in contempt were filed in this cause on May 1, 1903, against *William Cooper, F. W. Schwegman, George Slayline, Charles Faber, Jos. Somhorst, D. Harrigan, Gus. Rolfus, John Schumacher, John Houser* and *Ben. Schmitger,* alleging disobedience, resistance and violation of a restraining order issued by Judge Rufus B. Smith of this court in this cause on March 23, 1903, duly served on each and every one of the defendants.

The restraining order prohibited these defendants and others, among other things:

(1) From interfering with any person in the employ of plaintiff or who may desire to enter or to remain in the employ of plaintiff, by way of threats, persuasions accompanied by threats, violence, insults, menaces, intimidations, or any other means calculated or intended to cause such persons to quit such employment against their free will, or to prevent such persons from entering into or continuing in the employment of the plaintiff against their free will.

(2) From congregating or loitering about or in the neighborhood of plaintiff's factory, with the intent to compel the employes of the plaintiff against their own free will to cease work for plaintiff, or to compel those who are seeking employment to desist from the same.

(3) ·From interfering with the free access of plaintiff's premises, and with their free return to their homes, boarding or other places to which they may desire to go.

(4)  From visiting the employes of the plaintiff at their homes against their will, and with the intent of their using insulting, menacing and violent language for the purpose of intimidating and threatening said employes.

(5)  From assaulting any of the employes of this plaintiff, or those about to enter its employ, with the intent of preventing said persons from entering the employment of the plaintiff and causing them to leave said employment.

With the charges were filed specifications setting forth various specific arts, with proper detail of time and circumstances.

The investigation of the charges was at a formal hearing and examination and cross-examination of witnesses in open court, both sides being represented by able counsel, and was fully argued at the conclusion of the testimony—these proceedings occupying two full days.

HOSEA, J.

I do not deem it necessary, at this time, to recite the testimony in any detail, as the same was taken stenographically, for any further use required.

On the part of the plaintiff, the presentation of facts, corroborated in numerous instances by various witnesses, fully sustained, to all intents, the specifications of the charges, and by consequence the charges themselves.  On the side of the defense, the testimony was mainly confined to individual denials of participation in assaults and other. more serious acts set forth in the specifications, whilst many material points were either not denied or were specifically admitted.

Neither does the case require a discussion of the legal rights and relations of employer and employed, as deduced from the authority of adjudicated cases, inasmuch as the sole question here presented is one of fact as to whether the order of the court had been violated.

The evidence establishes the fact that a "strike" is in progress at the factory of plaintiff, under the auspices of the Amalgamated Glass Workers' International Association of

America, Local No. 5, of which most or all of the defendants are members; that in aid of said strike, said organization has maintained, and is still maintaining, a so-called system of "picketing" in connection with plaintiff's factory on Oliver street, between Central avenue and John, in this city, with the avowed object and purpose of seducing away the employes of plaintiff ostensibly by persuasion and argument, but really, as judged by its character and results, for the purpose of producing a coercive pressure by intimidation of character clearly unlawful and prohibited by the terms of the injunction order.

It is shown that the so-called "pickets" are stationed in groups at both the near street corners, in numbers varying from three or four to eight or ten, directly in the path of the factory operatives going to and from their work to their homes, at the morning and evening hours, and that they also congregate near the factory at the noon hour. Others in sympathy with, but apparently not directly connected with the defendants, are nevertheless permitted to loiter with them, and contribute, at least by the addition of numbers, to the general intimidating effect of the system of picketing, as carried on.

But this general condition of intimidation has further and more serious elements. One case is shown where a group of men, five or more in number (including at least one of the defendants), passed by the factory at the noon hour, when the operatives were at the windows, and hurled the epithet of "scabs" at them across the street. Another in which the same offensive epithet was applied to the wife of one of the operatives in the dooryard of her home near by. Still another case of the same character is shown in evidence, with the additional annoyance of congregating and loitering about the house of a young operative with offensive and insulting conduct to the boy's mother at her home.

But still other and more serious elements of the strike situation are shown; namely, direct and brutal assaults on operatives, which, by whomever committed—whether by any of the defendants in person or not—were manifestly

committed by those in sympathy with the general purposes of the defendants, and in promotion of the strike.

Three of such assaults upon the operatives of plaintiff are clearly proven, one of which was so severe and dangerous as to confine the sufferer to his bed in care of a physician for several days, and bore cogent evidence of an attempt upon life by the use of a deadly weapon—which happily failed of effect. The man who was the object of this murderous assault testifies to previous persistent attempts of the defendants to seduce him away from his employment, and to threats against his life in case of refusal.

While direct testimony as to the identity of the assailants in these cases is lacking, yet the acts and declarations of various defendants, both before and subsequently, suggest such guilty knowledge if not actual connivance, as to make the defendants, for practical purposes, accessories; and it is candidly admitted by the defendants that although the fact of these assaults was known to members and officers of the union, yet no steps of any kind were taken or even suggested, looking to any preventive action, even to the extent of discountenancing such acts in connection with strike operations. The statements of witnesses who were officers of the union were to the effect that it was none of their business, and did not interest them.

Nevertheless, the testimony, as a whole, shows such concert of action and such unlawful purpose on the part of the defendants, as establishes the fact of unlawful conspiracy between the defendants and those associated with them; and it is elemental law that in such conspiracy, the acts and doings of one in furtherance of the unlawful purpose are the acts and doings of each and every other.

Whatever defendants in such cases may claim as the intention, the actual intention—concert of action being shown—must be judged by the character and results of the action itself; for it is also an elemental principle of law that a man's intentions are to be judged by his acts, and he is held, and properly held, responsible for the natural and inevitable consequences of his voluntary acts in virtue of an intention which the law conclusively presumes.

Viewing the status of affairs as shown by the testimony, in its general aspect, the defendants have maintained and are maintaining a condition which it was and is the manifest purpose of the injunction order to prevent; namely, a condition of active and offensive intimidation directed against the plaintiffs and their employes to compel acquiescence in their demands by seducing and driving away employes, and thus cripple the business of plaintiff, as a means to their desired end. The continuation of these conditions must produce serious injury to plaintiff, but is also a serious injury to the community at large.

The Bill of Rights of the Constitution of Ohio guarantees to every citizen as an inalienable right, among others, that of acquiring, possessing and protecting property, and of seeking and obtaining happiness and safety; and it is therein further provided that the courts shall be open to every one for the exercise of his remedy by due course of law for an injury done him in his land, goods, person, etc. No one need be told that the right to carry on a legitimate business freely, without molestation or hindrance, is not only the right and privilege of the citizen under the fundamental guarantees of the Constitution, but is essential to the well-being of every civilized community, and that it is the duty of courts to afford every reasonable protection to the exercise of such right.

The right of the laboring man, whose business capital is his skill or industry, is to be upheld and protected equally with the right of an employer of labor to carry on manufacture involving such employment, and the fact that the rights of these two are reciprocal, in no wise lessens the obligations of the courts to see that these rights are properly protected.

In the present case, this court, in the plain interest of justice and for the purpose of affording protection against unwarrantable molestation of the plaintiffs in the conduct of their business as manufacturers, issued the restraining order against the defendants and those co-operating with them; and there can be no question upon the evidence here, that it has been openly and persistently violated.

It is therefore the duty of the court to take action as the law provides, and according to its sworn duty.

Section 5640 of the Revised Statutes defines certain acts as contempts of court, among which are:

"Disobedience of or resistance to a lawful writ, process, order, rule, judgment or command of a court or officer."

The sections immediately following relate to the method of bringing acts of contempt to the attention of the court, and of investigating same, and Section 5645 authorizes the limit of punishment in the event of the accused being found guilty. The punishment may be a fine or imprisonment, or both. It is the duty of the court, therefore, to announce its conclusions and take action in accordance therewith.

The parties charged will stand forth as their names are called:

F. W. Schwegman, John Schumacher, Charles Faber, Joseph Somhorst, John Houser, Ben. Schmitger, Geo. Slayline, D. Harrigan, Gus. Rolfus and Wm. Cooper.

You and each of you are charged with violating the restraining order heretofore issued by a judge of this court, and duly served upon you. The charge has been duly investigated in the mode required by law; you have been present throughout and met and heard the witnesses against you face to face, and have had the opportunity to testify and present witnesses in your own behalf, and have been represented throughout by able counsel who has zealously guarded your every right and presented your defense in full argument before me.

Having carefully weighed and considered all the testimony and the arguments thereon, I am satisfied beyond question or doubt upon the evidence that you and each of you are guilty of the contempt charged, and I so adjudge.

But, while all are guilty of violating the order of the court, the action of some is more reprehensible than that of others. Thus: Harrigan, Slayline, Somhorst, Faber and Schumacher appear to have been pickets, merely, carry-

ing out with varying degrees of pernicious activity the instructions of their union and its officers—as private soldiers carry out the orders of their superiors.

Schwegman and Cooper, however, were the treasurer and vice-president, respectively, of the union, and Schwegman seems to have been the active field officer, directing the action of others to a great extent. Cooper is shown to have actively entered the premises of young Frank Hay and took him out forcibly to compel him to quit the service of plaintiff. Both these officers stood by and permitted the union to give money to Rolfus, who, there is reason to believe, was a participant in one or more of the assaults, in order that he might leave the city after the service of the summons in contempt, and thus prevent his attendance in response to said summons. He was not a member of their union, therefore, they have not even this excuse to offer.

Schmitger, who seems to be known as "Jack the Fighter," was guilty of a most flagrant offense at the door of the courtroom during the investigation, by insulting two of the witnesses, wives of two of the non-union operatives, with the manifest purpose of intimidation—an offense that might fully justify the application of a still more stringent statute without limitation as to the degree of punishment. Such actions bring disgrace upon the cause of labor and merit the condemnation of all good citizens. Before imposing punishment I will give an opportunity to each of you to say, if anything you have to say, why the punishment to be imposed should not be substantial and severe.

[No response.]

BY THE COURT: (The parties having declined response.)

It is ordered and adjudged that (1) D. Harrigan, (2) George Slayline, (3) John Houser, (4) Joseph Somhorst, (5) Charles Faber, (6) John Schumacher, having been adjudged guilty of disobedience of a lawful order of this court, to-wit, a restraining order issued in this cause on March 23, 1903, which said disobedience was and is a con-

tempt of court under the statutes of Ohio, be and each of them is fined in the sum of ten dollars ($10).

That William Cooper, F. W. Schwegman and Ben. Schmitger, being adjudged guilty as aforesaid, be and each of them is fined in the sum of twenty-five dollars ($25) and shall be imprisoned in the county jail for a period of five days.

That an attachment issue for Gus. Rolfus, and when brought in, that he be remanded to the custody of the sheriff, pending the further order of the court in the premises.

The restraining order of March 23—it may be well to state—is still in force; and while the others shown by the evidence to have taken part in its violation, can not be dealt with at this time, because no charges have as yet been filed, they and all others are to take notice that any further violation will be more severly dealt with.

(Upon application of counsel for defendants, concurred in by counsel for plaintiff, and promise on the part of defendants to refrain from any further violations of the order, the execution of the sentences was suspended until the further order of the court.)

*Frank F. Dinsmore,* for plaintiff.
*Aug. Bruck,* for defendants.